UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff<br><br>v.<br><br>TROPICAL FRUIT, S.E.; AVSHALOM LUBIN; CESAR OTERO ACEVEDO; and PEDRO TOLEDO GONZALEZ<br><br>Defendants | Civil Action No. 97-1442-DRD |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION IN COMPLIANCE WITH ORDER TO SHOW CAUSE**

TO THE HONORABLE COURT:

COME NOW defendants, Tropical Fruit, S.E., Avshalom Lubin, César Otero Acevedo and Pedro Toledo González (hereinafter referred to collectively as "Defendants" "Tropical Fruit"), represented by the undersigned counsel, and very respectfully allege and pray:

**INTRODUCTION**

Pursuant to the Consent Decree entered on October 25, 2001 ('the Consent Decree"), Tropical Fruit has made diligent, good faith efforts to comply with its terms at the farm it owns and operates at Road No. 335, Km. 7.2, Rural Zone Boca, Guayanilla, Puerto Rico, and where mangoes and bananas are grown ("the Farm").   Nevertheless, in the motion for contempt, for  injunctive and monetary relief filed by the United States on behalf of the Environmental Protection Agency ("EPA"), Plaintiff alleges that Defendants have failed to comply the Consent Decree and requests, <u>inter alia</u>,  that the Court order Tropical

Fruit "to plant the required neem trees"; "to properly cultivate all neem trees"; "to remove all mango and banana trees from the No-Spray Zone"; and "to immediately stop hand-spraying pesticides in the No-Spray Zone". Furthermore, Plaintiff also asks the Court to order Defendants "to comply with worker protection requirements", "to properly notify the EPA of pesticide applications" and "to pay stipulated penalties for the [alleged] violations of the Consent Decree in an amount of not less than $130,000". Plaintiff has gone so far as to request relief outside the scope of the Consent Decree, such as, a "Hand-Spray Only Zone as an additional measure to protect the Guayanilla community until the neem trees grow to an adequate height to serve as a barrier", and reserving the right to request the appointment of a Special Master.

In showing cause why the appearing parties should not be held in contempt, nor ordered to immediately comply with the terms of the Consent Decree as interpreted by the EPA, Defendants will show that the required neem trees have been developed and planted since on or about October 2001; that afterwards, the neem trees have been properly cultivated and replaced so that the current average height of the neem trees is approximately twenty-five (25) feet despite the damage caused during rainy seasons; and that no hand-spraying of pesticides in the No-Spray Zone has been conducted since the effective date of the Consent Decree prohibition, on October 25, 2001.

Defendants will also show that since March 2002 and thereafter, including the time of the inspections to which Plaintiff refers in its motion for contempt, the Farm's workers have received training on pesticide handling, that Defendants have consistently complied with worker protection requirements and/or timely corrected any findings of non-compliance, and that Defendants have properly notified EPA of pesticide applications.

As there has been substantial compliance with the Consent Decree as a whole, Plaintiff's request for an order requiring Defendants to pay stipulated penalties should not be granted.

As further discussed below, upon examining the factual basis for Plaintiff's request for relief both in light of the terms and provisions of the Consent Decree and the events that followed its execution and implementation, it becomes evident that the EPA has failed to meet its burden of providing clear and convincing evidence of Tropical Fruit's alleged contemptuous behavior. Moreover, Defendants' conduct throughout more that three years demonstrates diligent, good faith efforts which amount to substantial compliance with the Consent Decree and its underlying reasons. Significantly, since the entry of the Consent Decree, Tropical Fruit has not received any written complaints from neighbors or regulatory agencies with regard to allegations of pesticide drifts. It seems clear that in such circumstances there is no need to grant Plaintiff's request for additional measures outside the scope of the Consent Decree to purportedly protect the Guayanilla community.

Pursuant to the applicable First Circuit law, in order to avert a finding of contempt, Defendants need not achieve "letter-perfect compliance [...] with the demands of the Consent Decree". Langton v. Johnston, 928 F.2d 1206, 1222 (1st Cir. 1991). In the case at bar, Defendants have substantially complied with the overall mandate of the Consent Decree. Consequently, as in the cited case, Plaintiff's request for relief should be denied.

## I.      RELEVANT FACTUAL BACKGROUND

1.      Since on or about October 2001, the neem trees which constitute the Outer Vegetative Barrier and the Inner Vegetative Barrier as defined in the Consent Decree were developed and initially planted at the Farm. At the time of the initial planting, the neem

trees were approximately 1.5 feet in height.  When planted, the neem trees were staked for support.  Since their planting, the neem trees have been drip irrigated, and have been replaced as necessary to preserve consistent rows with the purpose of the neem trees ultimately achieving and maintaining a height of approximately thirty (30) feet. <u>See</u> Exhibit 1, Statement Under Penalty of Perjury by Farm Manager and Project Coordinator, Mr. Ilan Oliver Bender ("Exh. 1"), ¶ 1, and Exh. 1, ¶ 35 and its attached Exhibit 13, and Exh. 1, ¶ 36 and its attached Exhibit 14.

2.    On or about November 19, 2001, Tropical Fruit submitted to the EPA a Work Plan drafted by Mr. Eugenio E. Toro, a retired fruit specialist and former Professor of Fruticulture at the University of Puerto Rico, Mayagüez Campus, who is a consultant with regard to the Farm. <u>See</u> Exhibit 2, Statement Under Penalty of Perjury by Fruit Specialist and Consultant, Mr. Eugenio E. Toro ("Exh. 2").   The Work Plan drafted by Mr. Toro, and related documents, established the manner in which the Farm would implement the buffer zone and vegetative barrier provisions of the Consent Decree.

3.    As of April 29, 2005, the approximate height of the neem trees which constitute the Outer Vegetative Barrier and the Inner Vegetative Barrier is of twenty-five (25) feet. <u>Id</u>.; and Exh. 1, ¶ ¶ 33 and 34 and their attached Exhibits 11 and 12.

4.    Since on or about October 2001, Tropical Fruit, S.P., has employed the best planting and maintenance practices for the neem trees which constitute the Outer Vegetative Barrier and the Inner Vegetative Barrier. <u>See</u>  Exh. 2, ¶ 2.

5.    From time to time, some of the neem trees planted have died or become damaged and had to be replaced.  For the replacement of the trees, since 2001 up to the present, a nursery with a stock of a few hundred neem trees has been kept at the Farm for

any and all tree replacement needs.   See Exh. 1, ¶ ¶ 2 and 32, and its attached Exhibit 10.  See also Exh. 2,  ¶ 4.

6.     The replacement neem trees have also been properly planted and maintained at the Farm. See Exh. 2, ¶ 5, and Exh. 1, ¶ 37 and its attached Exhibit 15.

7.     In the last three (3) years, replacement trees planted on the new river dike in Buffer Zone Segments B and C  have been replanted twice due to the river dike collapsing during rainy season. See Exh. 1, ¶ 24.

8.     In the opinion of Tropical Fruit's consultant Mr. Eugenio E. Toro, the adequate planting and maintenance of the original and replacement neem trees which constitute the  the Outer Vegetative Barrier and the Inner Vegetative Barrier at the Farm cannot guarantee that the neem trees will achieve a 30 feet height within a specific time frame. See Exh. 2, ¶ 6.

9.     On December 20 and 21, 2001, *Tilt*, an in stock pesticide included in a list in use at the Farm since before the Consent Decree was entered into and which had been previously approved by the EPA, was applied on the Vega Sectors. The spraying of *Tilt* on bananas as was done on December 20 and 21, 2001 does not create a drift of more than a few feet.  After the application of *Tilt* on December 20 and 21, 2001 no complaints from the neighbors of the Farm were received. See Exh. 1, ¶ 3.

10.     Mr. Rafael Inglés, the individual appointed by the EPA to monitor the hand-spraying operations at the Farm pursuant to the Consent Decree started working at the Farm on or about March 2002. See Exh. 1, ¶ 4.

11.     Since on or about March 7, 2002, the Farm Manager, Mr. Ilan Oliver was also appointed as Project Coordinator pursuant to the Consent Decree. See Exh. 1.

5

12.     From March 2002, up to the present, the Farm has properly notified EPA of prospective pesticide applications  using Attachment No. 5 of the Consent Decree entitled *Tropical Fruit Projected Application Schedule.* See Exh. 1, ¶ 5.

13.     On March 9, 20 and 22, 2002, *Gramoxone*, a herbicide used to maintain areas clean from weeds was applied on the borders of the Vega Sectors by lower pressure sprayers on ground level.   The application of *Gramoxone* on ground level does not create a drift of more than a few feet. The application of *Gramoxone* took place on the inner slopes of the river dike and the inner roads which border the Vega Sectors Sectors on the south side, that is, in the farthest part of the Vega Sectors in relation to Buffer Zone Segments E & F of Attachment No. 1 of the Consent Decree.  See Exh. 1, ¶ 6.

14.     At the time of the application, *Gramoxone* was approved by the EPA for use in other sectors of the  Farm.  *Gramoxone* was included in a list in use at the Farm since before the Consent Decree was entered into, which had been previously provided to and approved by the EPA. See Exh. 1, ¶ 7.  See, also Attachment No. 6 of the Consent Decree, which  refers to *Gramoxone*, as approved for use in other sectors of the Farm.

15.     The monthly progress report for March 2002 mistakenly stated that *Gramoxone* had been applied in Vega Sectors 1, 3 and 4. See Exh. 1, ¶ 8.

16.     Nevertheless, *Gramoxone* was not applied in Vega Sectors 1, 3 and 4 on March 9, 20 and 22, 2002. See Exh. 1, ¶ 9.

17.     On March 11, 2002, EPA Worker Protection Standard Training Handler Verification Cards were issued to the Farm's workers following the completion of the official Pesticide Handler and Worker safety training as required by the Federal Worker Protection Standard.   The training was conducted by Ms. Anna D. Martínez from the PRDA,

6

Laboratorio Agrológico.  See Exh. 1, ¶ 10, and its attached Exhibit 2, evidence of several of the cards issued by the EPA to the Farm's workers on March 11, 2002.  The samples of the cards include those of the irrigation team supervised by Mr. Roberto Vélez. Id.

18.    For September 3, 2002, Mr. Oliver had scheduled with Mr. Rafael Inglés, the individual appointed by the EPA to monitor the Farm's compliance with the hand-spray provisions of the Consent Decree ("the Monitor'), a manual application which was to be conducted during the afternoon.  Mr.  Roberto Rivera Vélez, an EPA-PRDA inspector had been noticed of the hand-spray application, as per his request. Mr. Rivera told to Mr. Oliver that he intended to take a sample from the spraying mixture during the scheduled hand-spray application on September 3, 2002.  See Exh. 1, ¶ 11.

19.    On September 3, 2002, on or about 1:00 pm, Mr. Oliver received a telephone call from Mr. Inglés.  During the course of the conversation, the Monitor told Mr.Oliver that he had other obligations and could not come to the Farm. See Exh. 1, ¶ 12.

20.    After the telephone call, EPA-PRDA inspector Rivera could not be reached and he arrived at the Farm about an hour later.  At the time, all of the documentation for the hand-spray application was ready.  The necessary personnel and equipment were also prepared.  The wind and weather conditions were suitable.  Upon his arrival, Mr. Rivera said that he could monitor the application according to the applicable regulations and to the limitations and provisions of the Consent Decree. The hand-spray application was conducted then.  Mr. Rivera  took the sample of the spraying mixture.  Mr. Rivera did not complain or cause  a notice of violation to be issued about any aspect of the application on September 3, 2002 or thereafter. See Exh. 1, ¶ 13.

21.    Any variations between the monthly prospective schedules submitted to the

EPA by Tropical Fruit and the actual monthly spray records are a consequence of commercial mango growing in tropical conditions. Decisions regarding the pesticides to be applied and the concentration of such pesticides ordinarily have to be taken in real time and in accordance with the scouting results of the same day in order to control some diseases in time. Tropical Fruit has consistently taken these decisions in compliance with the EPA regulations and the limitations of the Consent Decree. See Exh. 1, ¶ 15.

22.    On February 26, 2003, Mr. Oliver was present at the routine inspection conducted at the Farm by EPA-PRDA inspector Mr. Roberto Rivera Vélez, accompanied by Ms. Lizette Lugo from the EPA and EPA-PRDA inspector Mr. Juan C. Muñoz, with regard to compliance with pesticide worker protection standards, regulations and pesticide label requirements.   During the inspection by Mr. Rivera, he notified Mr. Oliver of non-compliance with the following four (4) worker protection standards: the pesticide application records posted in the bulletin board was not updated; workers' training records were not updated; a group of workers that were harvesting mangoes in Sectors 9 and 10 did not have decontamination supplies such as soap, paper towels, running water and eye wash facilities with them; and a warning sign for a treated area was left on site over the expiration time of the restricted entry interval. See Exh. 1, ¶ 16, and its attached Exhibit 2.

23.    During the inspection, Mr. Muñoz stated to Mr. Oliver that if the Farm corrected the findings above described within a two week period, the lack of compliance would not be considered a violation. Id.

24.    During the inspection of February 26, 2003 the Farm's workers who were harvesting mangoes had with them the Handler cards issued on March 11, 2002 by the

EPA.  See Exh. 1, ¶ 17.

25.    A follow-up inspection was conducted on March 13, 2003 conducted by EPA-PRDA inspector Mr. Roberto Rivera accompanied by EPA-PRDA inspector Mr. Juan C. Muñoz and Ms. Najda Alvarez in the presence of Mr. Oliver. During the follow-up inspection, Mr. Oliver was informed by both Mr. Rivera and Mr. Muñoz that the Farm had fully complied with all the worker protection standards and requirements discussed during the February 26, 2003 inspection.  Both Mr. Rivera and Mr. Muñoz mentioned to Mr. Oliver that they were satisfied with the quick and full compliance achieved and recommended that the Farm continue in this way. See Exh. 1, ¶ 18.   Due to the expressions of Mr. Rivera and Mr. Muñoz, Tropical Fruit understood the matter was closed.  Id.

26.    Nevertheless, on April 17, 2003 a notice of violation was issued by the PRDA Laboratorio Agrológico Interim Director, Ms. Carmen H. Zayas, to the Farm. See Exh. 1, ¶ 19, and its attached Exhibit 4.

27.    Tropical Fruit responded in a letter sent on May 6, 2003 by certified mail to Ms. Carmen Zayas.  In the letter, the events of February 26 and March 13, 2003 were explained to the PRDA.  Following the receipt of such response on May 9, 2003, no further action was taken by the PRDA.  See Exh. 1, ¶ 19, and its attached Exhibit 5.

28.    On March 28, 2003 and May 7,13, and 28, 2003 more than forty (40) employees of Tropical Fruit  received a video training on worker protection standards which was supplied by an EPA representative.  See Exh. 1, ¶ 20, and its attached Exhibit 6 which includes evidence of the training certificates signed on March 28, 2003 and May 7 ad 13, 2003.

29.    To date, Tropical Fruit provides the video training supplied by the EPA to

each new employee when he starts working at the Farm. <u>See</u> Exh. 1, ¶ 21.

30.     Since on or about June 12, 2003, Tropical Fruit, in good faith, has presented to the EPA, proposals and requests for the modification of certain aspects of the Consent Decree.  Specifically, the Farm has proposed options to address the critical consequences of removing in excess of 1000 fully grown mango trees to allow for the planting of plantains, a measure which was considered as the only available option for the Buffer Zone at the time the Consent Decree was entered.  <u>See</u> Exhibit 3, letter dated  June 12, 2003 from Mr. Jaime Sifre Rodríguez, Esq. to Mr. Eric Schaaf, Esq.

31.     Tropical Fruit proposed that the Consent Decree be modified to protect the environment and the community while allowing the Farm to operate in a more efficient manner as follows:

> 1.     Allow the neem trees in the buffer zone to grow to their maximum height and density before destroying the mango trees.
>
> 2.     Leave the mango trees as they are and establish adequate restrictions on how to apply pesticide to that particular section.
>
> 3.     Once the neem trees grow to their optimum height and density, make a test to see how the neem trees are working as a buffer zone and if they work adequately, then allow the farm to retain the mango trees and to spray them with a mechanism agreeable to the parties.

> <u>Id</u>.

32.     Tropical Fruit's proposal was denied by the EPA.  <u>See</u> attachment to Declaration of Ms. Naomi Shapiro, Esq., Docket No. 95.

33.     From November 12 to November 14, 2003, heavy rains caused the Río Yauco to overflow and certain sectors of the Farm were flooded.  As a result of the floods,

a portion of the neem barrier located at Buffer Zone Segment B and C was destroyed and/or damaged. <u>See</u> Exh. 1, ¶ 22, and its attached Exhibit 7.

34.    After the floods of November 2003, Tropical Fruit took all adequate steps to replace the destroyed neem barrier, by planting, irrigating and properly cultivating the replacement neem trees in Segments B and C of the Buffer Zone. <u>See</u> Exh. 1, ¶ 23.

35.    On or about February 23, 2004, Tropical Fruit once again proposed the modification of the terms of the Consent Decree, and the enhancement of the Buffer Zone using mango trees as part thereof. <u>See</u> Exhibit 4, letter dated February 23, 2004 from Mr. Jaime Sifre Rodríguez, Esq. to Ms. Naomi Shapiro, Esq., and its enclosures. The proposed amendment to the Buffer Zone would maintain approximately 1400 mango trees along the Buffer Zone while applying organic and biological care and management treatment and establishing an insect and disease control program with organic and biological pesticides already registered and approved by the EPA and other regulatory agencies.   The Farm's request for the EPA to modify the terms was premised on the availability of certain  organic products registered and approved by EPA for use in mangoes which were not available at the time of the entry of the Consent Decree.

36.    Tropical Fruit's request was, once again, rejected by the EPA. <u>See</u> attachment to Declaration of Ms. Naomi Shapiro, Esq., Docket No. 95.

37.    On March 12, 2004, Mr. Oliver was present during an operational inspection performed by EPA-PRDA inspector Mr. Roberto Rivera Vélez, EPA-PRDA inspector Juan C. Muñoz and EPA Enforcement Officer, Mr. Vera Soltero.   During the inspection, Mr. Rivera, Mr. Muñoz and Mr, Soltero checked a manual spraying in Sections 1, 3 and 5 and an irrigation maintenance group supervised by Mr. Robert Vélez, which was working on

Sections 20-21. The inspectors took samples from the spraying liquid and checked the decontamination equipment. After asking Mr. Oliver to leave, the inspectors interviewed the workers of the irrigation maintenance group.  <u>See</u> Exh. 1, ¶ 25 and its attached Exhibit 8.  During the inspection of March 12. 2004  the  Farm's irrigation team interviewed by Mr. Rivera had with them the Handler cards on pesticide training issued by EPA on March 11, 2002. <u>See</u> Exh. 1, ¶ 27.

38.    The members of the irrigation team interviewed by Mr. Rivera on March 12, 2004 had received training on worker protection standards during March or May 2003. <u>See</u> Exh. 1, ¶ 28.

39.    On March 26, 2004, a follow-up inspection was conducted by EPA-PRDA inspector Mr. Rivera with regard to the findings of March 12, 2004. <u>See</u> Exh. 1, ¶ 26 and its attached Exhibit 9.

40.    After the inspections conducted on March 12, 2004 and March 26, 2004, no notice of violation was issued by the PRDA to Tropical Fruit.  <u>See</u> Exh. 1, ¶ 29.

41.    On August 18, 2004, Tropical Fruit once again  proposed to the EPA the revisiting of the  Consent Decree in order to consider the new organic/biological materials available.  Tropical Fruit proposed the use of such materials to accommodate both parties' interest in protecting the nearby neighbors while lessening the economic impact on the Farm.  <u>See</u> attachment to Declaration of Ms. Naomi Shapiro, Esq., Docket No. 95.

42.    No answer from the EPA has been received by Tropical Fruit.

43.    In the monthly reports which scheduled the future spraying of pesticides during November and December 2004, the Farm mistakenly continued to include Sectors 1, 2, 3, 5 and 7 in the hand-spraying operation. Upon notice from EPA, the mistake was

corrected by Tropical Fruit. See Exh. 1, ¶ 30.

44.    Nevertheless, since October 25, 2004 and up to the present no hand-spray operation has been performed in areas in which hand-spraying is prohibited after October 25, 2004 pursuant to the terms of the Consent Decree.  See Exh. 1, ¶ 31.

45.    Since on or about October 25, 2001, and up to the present, Tropical Fruit, S.E. has used its piece of property at the Farm adjacent to Buffer Zone Segments B-D, known as the "cow pasture" and the strip of land immediately to the east of the cow pasture up to but not including the westernmost of the residents adjacent to Buffer Zone Segment D only for agricultural activities that do not require the application of pesticides or fertilizers through airblast or hand-spray application. See Exh. 1, ¶ 39.

44.    Since on or about October 25, 2001, and up to the present, Tropical Fruit, S.E. has used its piece of property at the Farm in the portions of the Vega Sectors which lie within the Buffer Zone only for the cultivation of bananas. See Exh. 1, ¶ 40.

45.    As of this date, the deed restriction contemplated by the Consent Decree to be placed on the properties described in the preceding paragraphs 38 and 39 has been prepared by Tropical Fruit.  See Exhibit 5, Instance by Tropical Fruit limited partner, Mr. Pedro Toledo González, notarized in May 3, 2005.  The deed restriction was caused  to be filed at the Registry of Property in Ponce, Puerto Rico by Tropical Fruit.[1]

46.    Since on or about October 25, 2001, and up to the present, the Farm has not received any written complaints from neighbors or regulatory agencies with regard to allegations of pesticide drifts. See Exh. 1, ¶ 38.

---

[1]    At the time of this filing, Defendants have not received evidence of the filing of the instance to be recorded at the Registry of the Property in Ponce, Puerto Rico. As soon as such evidence is received, a copy of the filed instance will be submitted to the Court.

13

## II.    APPLICABLE LAW

As a general rule, a complainant must prove civil contempt by clear and convincing evidence. Accusoft Corporation v. Palo, et al., 237 F.3d 31, 47 (1st Cir. 2001); Gemco LatinoAmerica,Inc.v. Seiko Time Corp., 61 F.3d 94, 98 (1st Cir. 1995);   Langton v. Johnston,928 F.2d at 1220; AMF, Inc. v. Jewett, 711 F.2d 1096, 1100 (1st Cir. 1983). Furthermore, contempt may only be established if the order allegedly violated is "clear and unambiguous", that is, "the party enjoined must be able to ascertain from the four corners of the order precisely what acts are forbidden".  Project B.A.S.I.C. v, Kemp, 947 F.2d 11, 16-17 (1st Cir. 1991).   Consequently, "[c]ourts are to construe ambiguities and omissions in consent decrees as redounding to the benefit of the person charged with contempt." Gilday v. Dubois, 124 F.3d 277, 282 (1st Cir. 1997), as cited in Accusoft Corporation v. Palo, et al., 237 F.3d at 47.

Pursuant to First Circuit law, diligent, good faith efforts which result in substantial compliance with the underlying order are sufficient to avert a finding of contempt. Langton v. Johnston,928 F.2d at 1220.  As the Court of Appeals for the First Circuit stated in the cited case:

> That is to say, the decrees at issue here, like most such decrees, were susceptible to satisfaction by diligent, good faith efforts, culminating in substantial compliance. See, e.g., Howard Johnson Co. v. Khimani, 892 F.2d 1512, 1516 (11th Cir. 1990) ("Conduct that evinces substantial, but not complete, compliance with the court order may be excused if  it was part of a good faith effort at compliance."); Drywall Tapers, Local 1974 v. Local 530, 889 F.2d 389, 394 (2nd Cir. 1989) ("A court may hold a party in civil contempt only if ... 'the defendant has not been reasonably diligent and energetic in attempting to accomplish what was ordered.'") (citation omitted), cert. denied, 494 U.S. 1030, 110 S. Ct. 1478, 108 L. Ed. 2d 615 (1990); Balla v. Idaho State Bd. of Corrections, 869 F.2d 461, 466 (9th Cir. 1989) ("Substantial compliance with a court order is a defense to an action for civil contempt."); see also Board of Educ. v. Dowell, 498 U.S. 237, 112 L. Ed. 2d 715, 111 S. Ct. 630, 638  (1991) (question of whether school board complied with

desegregation order depends on whether board acted in good faith and whether vestiges of past discrimination had been eradicated to the extent practicable.) Id.

In affirming a ruling of "no contempt", the Langton Court found that when "there is neither letter-perfect compliance with, nor palpable disregard for, the demands of a consent decree", there is no abuse of discretion in the denial of a motion for contempt by the district court. Id., at 1222. See, also, Accusoft, 237 F.3d at 47.

Generally, the determination of whether there has been substantiality in compliance efforts "will depend on the circumstances of each case, including the nature of the interest at stake and the degree to which noncompliance affects that interest." Fortin v. Commissioner of the Massachusetts Department of Public Welfare, 692 F.2d 790, 795 (1st Cir. 1982).

## III.    ARGUMENT

As the foregoing factual background shows, the factual basis for Plaintiff's motion for contempt lacks an adequate context and fails to present significant events as they ensued following the execution, entry and implementation of the Consent Decree.  As previously addressed, most of the facts on which Plaintiff has relied are inaccurate and/or cannot satisfy the required burden of proof to establish the alleged contempt of Defendants with regard to the compliance with the terms of the Consent Decree.

Contrary to Plaintiff's sweeping allegations, on November 19, 2001, within the time allocated by the Consent Decree, Tropical Fruit complied with submitting the Work Plan therein required.   The Work Plan has been substantially implemented as to the Buffer Zone and Outer Vegetative Barrier and Inner Vegetative Barrier provisions of the Consent Decree, which are to be coordinated in a phased approach as soon as practicable with the

ultimate attainment of average neem tree heights of thirty (30) feet.  <u>See</u>, Consent Decree, ¶ 17.

Since 2001, Tropical Fruit has complied with planting, irrigating, properly cultivating, adequately maintaining, and replacing, when necessary,  the neem trees which constitute the Outer Vegetative Barrier and the Inner Vegetative Barrier at the Farm, as conditions have reasonably allowed.  If some of neem trees have not grown uniformly in rows of an average height of thirty (30) feet since they were initially planted or replaced it has not been a as result of Defendants' inadequacies in their efforts.

The lack of uniform growth alleged by the EPA is a result of the damage caused by successive rainy seasons, which in turn has required consecutive replacement of the trees in certain portion of the Buffer Zone.   At all times pertinent, Tropical Fruit has kept a nursery with a few hundred trees has been in order to ensure that enough replacements will be available <u>in situ</u> for the replanting required by the Consent Decree.  Despite the damages caused by the rains, due to the  efforts of Tropical Fruit, currently the average height of the neem trees at the Farm is of twenty-five (25) feet.

Nevertheless, pursuant to the provisions of the Consent Decree, ¶ 17, the removal and/or relocation of the mango trees located within the 173 foot No-Spray Zone is the final step of the Work Plan to be implemented once the neem trees have reached a height of approximately 30 feet.  In accordance with the Consent Decree,  ¶ 17, the removal or relocation of the trees is subject to the following:

> The Work Plan shall provide for a period of implementation that shall not exceed three years from the entry of this Consent Decree  provided that by the end of three years, the trees comprising the Inner and Outer Vegetative Barriers, in the determination of EPA, have attained the height of approximately  30 feet. <u>Id</u>.

To date, the neem trees which comprise the Outer and Inner Vegetative Barriers have not attained the height of approximately 30 feet. Therefore, a plausible interpretation of the cited paragraph is that the ultimate removal or relocation of the trees along the No-Spray Zone is still not called for. Notwithstanding, since June 2003, Tropical Fruit, while substantially complying with the terms of the Consent Decree as previously, has repeatedly requested from Plaintiff a modification or amendment of the provisions of the Consent Decree as interpreted by the EPA, in order to save the trees which would be affected and at the same time avoiding pesticide drift via the application of bio-pesticides or organic materials that were not a feasible alternative at the time of the entry of the Consent Decree. Plaintiff has rejected each and every proposal submitted by Defendants.

In its motion for contempt, Plaintiff avers that Tropical Fruit has violated the terms of the Consent Decree by hand-spraying pesticides in the No-Spray Zone. However, the facts show that there has been no hand-spraying in the No-Spray Zone after October 25, 2004. See Exh.1, ¶ ¶ 30 and 31. Therefore, Defendants have fully complied with the prohibition set forth in the Consent Decree.

As to the spraying of allegedly prohibited pesticides, *Tilt* in December 2001 and *Gramoxone* in March 2002, Tropical Fruit submits that there was no willful violation of the Consent Decree and that there was a mistaken report with regard to the location of the ground level application of *Gramoxone*. In December 2001, *Tilt* was a pesticide already purchased and in stock at the Farm at the time of the entry of the Consent Decree. Accordingly, *Tilt* was included in a list previously approved by the EPA. The spraying of *Tilt* on bananas did not create a drift of more than a few feet and no complaints from the neighbors of the Farm were received. See, Exh. 1, ¶ 3. In March 2002, *Gramoxone*, a

17

herbicide included in Attachment No.6 of the Consent Decree as approved for use in "other sectors" of the Farm, which is used to maintain areas clean from weeds was applied on the borders of the Vega Sectors, by lower pressure sprayers on ground level. The monthly progress report for March 2002 mistakenly stated that *Gramoxone* had been applied in Vega Sectors 1, 3 and 4. Nevertheless, *Gramoxone* was not applied in Vega Sectors 1, 3 and 4 on March 9, 20 and 22, 2002. <u>See</u>, Exh. 1, ¶ ¶ 6, 7, 8 and 9.

Plaintiff alleges that Tropical Fruit violated the provisions of the Consent Decree by conducting hand-spray application of pesticides without the presence of the Monitor designated by the EPA. This allegation relies on an isolated event occurred in September 3, 2002. As clarified in the foregoing factual background, on such date, the Monitor called Mr. Oliver, the Farm Manager, an hour before the application scheduled was to take place to advise that due to other obligations he would not come to the Farm. <u>See</u>, Exh. 1, ¶ ¶ 11, 12. The EPA-PRDA inspector on whose declaration Plaintiff relies, Mr. Roberto Rivera Vélez came to the Farm in order to take a sample from the spraying mixture. <u>See</u>, Exh. 1, ¶ ¶ 11, 13. Mr. Rivera stated that he could monitor the application according to the applicable regulations and to the limitations and provisions of the Consent Decree. <u>Id</u>. Aside from eventually providing a declaration for Plaintiff's motion for contempt, Mr. Rivera did not complain about any aspect of the application nor cause the issuance of a notice of violation at the time. <u>See</u>, Exh. 1, ¶ 13. In such circumstances, there is no clear and convincing evidence that could support a finding of contempt.

As to the advance notice of pesticide applications to the EPA, Defendants have consistently complied with such submissions since March 2002, the date when the provisions of the Consent Decree were effectively implemented with regard to the start of

18

the work of the individual appointed by EPA to monitor hand-spray applications at the Farm, Mr. Rafael Inglés and when Mr. Ilan Oliver was also appointed as Project Coordinator.  <u>See</u>, Exh. 1, ¶ 4.  It is evident that there has been substantial compliance with the Consent Decree provision particularly in view of the fact that both the Monitor and the Project Coordinator started to implement their positions in March 2002.

With regard to the alleged violation of the Consent Decree for variations between the prospective schedules and the actual spray records, Defendants have consistently provided EPA with both forms since the entry of the Consent Decree.  <u>See</u>, Exh. 1, ¶ 14. The variations Any variations between the monthly prospective schedules submitted to the EPA by Tropical Fruit and the actual monthly spray records are a consequence of commercial mango growing in tropical conditions. Decisions regarding the pesticides to be applied and the concentration of such pesticides ordinarily have to be taken in real time and in accordance with the scouting results of the same day in order to control some diseases in time.  Tropical Fruit has consistently taken these decisions in compliance with the EPA regulations and the limitations of the Consent Decree. <u>See</u> Exh. 1, ¶ 15. Consistency between the prospective schedules and the actual spray records cannot be reasonably be expected due to the above stated requirements of daily operations at the Farm.

Plaintiff avers that Defendants have violated worker protection requirements allegedly because there has been failure to properly train in pesticide handling and worker protection standards.  The facts show that since March 11, 2002 the Farm's workers were trained and issued Handler Verification Cards by the EPA. <u>See</u>, Exh. 1, ¶ 10 and its attached Exhibit 2.  Thereafter, more than forty (40) employees have received training in

19

Worker Protection Standards in March 28, 2003, and in May 7 and 13, 2003. <u>See</u>, Exh. 1, ¶ 20, and its attached Exhibit 6. Each new employee is trained on Worker Protection Standards when he starts working at the Farm. <u>See</u>, Exh. 1, ¶ 20. As to the inspection of February 26, 2003, besides the workers having evidence of their training with them, the findings of non-compliance were corrected and approved during a follow-up inspection in March 13, 2003. <u>See</u>, Exh. 1, ¶ ¶ 16, 17 and 18. Regarding the inspection of March 12, 2004, besides the workers having evidence of their handler training with them and having received worker protection standards training, there was no notice of violation issued. <u>See</u>, Exh. 1, ¶ ¶ 27, 28 and 29.

As to the land use restrictions, since on or about October 25, 2001 Defendants have, in effect, restricted the use of the property in accordance with the provisions of the Consent Decree. <u>See</u> Exh. 1, ¶ ¶ 38, 39. As of May 3, 2005, the deed restrictions were issued, notarized and caused to be filed at the Registry of the Property in Ponce, Puerto Rico.

**CONCLUSION**

In light of the above, Defendants submit that during more than three (3) years, since the entry of the Consent Decree in October 25, 2001, Defendants have taken diligent measures and undertaken good faith efforts that have resulted in substantial compliance with the overall mandate of the Consent Decree. In such circumstances, Plaintiff's request for contempt, injunctive and monetary relief relief should be denied.

WHEREFORE, it is respectfully requested that this Honorable Court deem its order complied with and consequently find that Defendants have showed cause why Plaintiffs' motion for Defendants to be held in contempt and ordered to immediately comply with the

terms of the Consent Decree as interpreted by the EPA should not be granted as requested.

Respectfully submitted.

In San Juan, Puerto Rico, on this 6th day of May, 2005.

I HEREBY CERTIFY that on May 6th, 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Mr. Henry Friedman, Esq., Environmental Enforcement Section, U. S. Department of Justice, PO Box 7611, Washington, D. C. 20044; Isabel Muñoz, Assistant United States Attorney, Federal Building, Room 452 Chardon Avenue, Hato Rey, Puerto Rico 00918.

I HEREBY CERTIFY that I have mailed by United States Postal Service the foregoing document to the following non CM/ECF participants: German A. González PO Box 190764 San Juan, PR 00919-0764.

> SANCHEZ-BETANCES, SIFRE,
> MUÑOZ-NOYA & RIVERA, PSC.
> Counsel for Defendants
> PO Box 195055
> San Juan, PR  00919-5055
> Tel. (787) 756-7880
> Fax (787) 753-6580
> jsifre@sbsmnr.com
> mvila@sbsmnr.com
>
> s/ Jaime Sifre Rodriguez
> ATTORNEY JAIME  SIFRE-RODRIGUEZ
> USDC-PR: 117409
>
> s/Marta E.Vila Baez
> MARTA E. VILA BAEZ
> USDC NO. 218111

H:\910.443\MOTIONS\049MEMORANDUMOFLAWINSUPPORTOFMOTIONINCOMPLIANCEWITHORDER.wpd