UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Civil Action No. 97-1442-DRD |
| v. | |
| TROPICAL FRUIT, S.E.; AVSHALOM LUBIN; CESAR OTERO ACEVEDO; and PEDRO TOLEDO GONZALEZ, | |
| Defendants. | |

UNITED STATES' MEMORANDUM IN SUPPORT OF ITS
MOTION TO ENTER SETTLEMENT AGREEMENT

The United States of America, by the authority of the Attorney General and on behalf of the United States Environmental Protection ("EPA"), moves for the entry of a Settlement Agreement entered into by the parties which was lodged with the Court on September 13, 2005, for the reasons set forth below.

I.  PRELIMINARY STATEMENT

Tropical Fruit, S.E. ("Tropical Fruit"), a special partnership organized under the laws of the Commonwealth of Puerto Rico, owns and operates a farm of approximately 2,300 acres in size at Road No. 335, KM 7.2, Rural Zone Boca, Guayanilla, Puerto Rico, at which it grows mangos, bananas and plantains ("the Farm").  See United States v. Tropical Fruit, S.E., 96 F.Supp.2d 71, 73 (D.P.R. 2000)).  Since beginning operations in 1991, Tropical Fruit has applied numerous pesticides to its crops, including Benlate, Kocide #101, Kocide LF and Malathion 25% (Final Pre-Trial Order, Statement of Uncontested Material Facts, ¶¶ 6, 7).

Following a request from the Puerto Rico Department of Agriculture to become involved in the matter, EPA, on December 20, 1996, issued an Administrative Order ("EPA Order") pursuant to Section 106(a) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9606(a), requiring Defendants to cease spraying pesticides that are or contain hazardous substances in such a manner that the pesticides drift beyond the boundaries of the Farm and to institute certain management practices to prevent drift. In March 1997, the United States filed this case on behalf of the EPA and alleged, inter alia, that Tropical Fruit violated the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 et seq., and CERCLA, by applying pesticides to agricultural crops, including mangos and bananas, in such a manner that the pesticides drifted or otherwise migrated beyond the boundaries of the Farm in contravention of the pesticide label requirements and the EPA Order.

On March 31, 2000, the Court ruled upon the United States' Motion for Partial Summary Judgment and issued a Decision and Order holding Tropical Fruit liable for certain violations of FIFRA and CERCLA and holding that Tropical Fruit is not exempt from liability under Section 107(i) of CERCLA. United States v. Tropical Fruit, S.E., 96 F.Supp.2d 71 (D.P.R. 2000).

On July 9, 2001, the trial commenced in this case on the questions of the permanent injunctive relief, if any, which would be imposed upon Tropical Fruit's pesticide spraying operations and the amount of civil penalties and CERCLA response costs for which Tropical Fruit, its partners and Mr. Lubin would be liable. On or about July 12, 2001 the parties reached an agreement-in-principle to resolve the issues that were the subject of the trial before the Court. On August 21, 2001, the United States lodged the Consent Decree which memorialized the

agreement-in-principle and which would resolve the issues before the Court.  On October 25, 2001, following a 30 day public comment period, this Court entered the Decree as an order of the Court (docket entry # 93).

The Consent Decree requires extensive injunctive relief to prevent pesticide drift including, inter alia, (i) planting a vegetative barrier comprised of neem trees at the border of the Farm to help stop the drift of pesticides beyond the borders of the Farm; and (ii) creating Buffer Zones, including the removal of mango trees and banana trees, and replacing them with plantain trees which will not be sprayed, which measures also will limit the drift of pesticides.  The Consent Decree allowed Tropical Fruit three years from the entry of the Consent Decree or until October 25, 2004 to complete compliance with these provisions of the Consent Decree.

On or about December 16, 2004, the United States filed a Motion to Enforce the Consent Decree, alleging that the Farm failed to comply with certain provisions of the Decree (docket entry # 95).  In this Motion, the United States alleged, among other things, that the Farm failed to either remove or relocate from the No-Spray Zone Buffer Zones all mango trees and replace them with plantain trees.  On July 14, 2005, the Court held a conference with the parties and heard argument on the United States' Motion.

On September 13, 2005, the parties lodged a Settlement Agreement with the Court which resolved the issues in the United States' Motion to Enforce (docket entry # 120).  The Settlement Agreement provides that the Consent Decree will remain in full force and effect, except as modified by therein. Settlement Agreement, ¶ 1.   Accordingly, the Consent Decree requirements that the Farm create a No-Spray Buffer Zone will remain in full force and effect.  In order to allow the Farm the opportunity to move the mango trees to other areas of the Farm

(instead of simply cutting them down), the Settlement Agreement allows the Defendants additional time to accomplish the relocation of the trees, which relocation must be completed by April 1 , 2006.  After all mango trees have been removed or relocated pursuant to the schedule set forth in this Settlement Agreement, the Settlement Agreement requires Defendants to commence planting of banana or plantain trees in the Buffer Zone areas and to conclude planting the banana or plantain trees by June 1, 2005.  Settlement Agreement, ¶¶ 3 and 5.

The Consent Decree further provides that Defendants shall be prohibited from spraying pesticides on the plantain trees[1] in the Buffer Zone areas.   The Settlement Agreement retains this requirement, with one modification.  The Settlement Agreement modifies the Consent Decree to allow the Farm to apply pesticides in the No-Spray Buffer Zones to address an outbreak of a plant disease, Sigatoka Negra, that came to affect agriculture in Puerto Rico after the entry of the Consent Decree.  In order to treat Sigatoka Negra at the Farm, the Settlement Agreement allows spraying of banana or plantain trees within the No-Spray Buffer Zone areas under limited conditions, including:

- The Farm must be able to demonstrate an actual outbreak or imminent threat of outbreak of Sigatoka Negra at the Farm;

- The Farm must be able to demonstrate the implementation of all applicable recommendations made in the Agricultural Extension Service's Circular concerning the control of Sigatoka Negra;

---

[1]  The Consent Decree required the Farm to plant plantain trees in the No-Spray Buffer Zone. The Settlement Agreement allows the Farm to plant plantain trees or banana trees.  Settlement Agreement, ¶ 4.  Other than as noted above, the Settlement Agreement retains all other Consent Decree requirements for the No-Spray Buffer Zones.

- Other than three pesticides that are non-toxic or of low toxicity[2], the only pesticides that the Farm may apply to treat Sigatoka Nega are those it is directed to apply by the Puerto Rico Department of Agriculture ("PRDA") or University of Puerto Rico Agricultural Extension Service or approved in advance by EPA; and

- In making any application to treat Sigatoka Negra, the Farm must take all applicable steps to reduce spray drift and comply with the label requirements of the applied pesticides.

Settlement Agreement, ¶ 10.

The Settlement Agreement requires Defendants to pay a civil penalty of $50,000 to address the Farm's violations of the Consent Decree. Settlement Agreement, ¶ 13.

Finally, the Settlement Agreement contains a provision, subject to the approval of this Honorable Court, that the Court hold bimonthly status conferences with the Court so that the Parties can raise issues concerning compliance. Settlement Agreement, ¶ 16. The United States respectfully requests that these status conferences be scheduled as telephonic conferences.

On September 22, 2005, notice of the settlement was published in the Federal Register, 70 Fed. Reg. 55627 - 28 (2005), which marked the beginning of a public comment period. Because this Federal Register Notice did not recite the length of the public comment period, on October 6, 2005, the United States published an amended notice of settlement in the Federal Register, 70 Fed. Reg. 58470 - 71 (2005), which marked the beginning of a 15-day comment period. The United States received no comments on the Settlement Agreement. For the reasons described below, the Settlement Agreement is fair, reasonable, and in the public interest, and should be approved by this Court.

---

[2] Application of these products may only be applied by ground boom sprayer or by hand-spray application or irrigation. Settlement Agreement, ¶ 10.a.iii.

II.  ARGUMENT

A. Standard of Judicial Review of the Consent Decree

Approval of a consent decree is a judicial act committed to the informed discretion of the trial court.  <u>United States v. Cannons Eng'g Corp.</u>, 720 F. Supp. 1027, 1035 (D. Mass. 1989), <u>aff'd</u>, 899 F.2d 79 (1st Cir. 1990).  Generally, when reviewing a settlement, the standard to be applied is whether the settlement is "fair, adequate, and reasonable."  <u>Walsh v. Great Atlantic & Pacific Tea Co.</u>, 726 F.2d 956, 965 (3rd Cir. 1983).  This standard has been affirmed for the review of CERCLA settlements.  <u>United States v. Cannons Eng'g Corp.</u>, 899 F.2d 79, 85 (1st Cir. 1990) (the court should enter a CERCLA consent decree if the decree "is reasonable, fair, and consistent with the purposes that CERCLA is intended to serve" quoting the House Report on the Superfund Amendments and Reauthorization Act of 1986, H.R. Rep. No. 99-253, Part 3 at 19 (1985), <u>reprinted in</u> 1986 U.S.C.C.A.N. 3038, 3042);  <u>United States v. DiBiase</u>, 45 F.3d 541, 543 (1st Cir. 1995).[3]

Judicial review of a settlement negotiated by the United States is subject to special deference.  As the First Circuit recently stated:

> Considerable deference is involved in the review of CERCLA consent decrees. . . . [T]here is deference to the administrative agency's construction of the settlement. "That so many affected parties, themselves knowledgeable and represented by experienced lawyers, have hammered out an agreement at arm's

---

[3] This standard has also been affirmed for settlements pursuant to other federal environmental laws.  See <u>Citizens for a Better Env't v. Gorsuch</u>, 718 F.2d 1117, 1126 (D.C. Cir. 1983) (under the Clean Water Act ("CWA"), the court "need only determine that the settlement is fair, adequate, reasonable and appropriate under the particular facts");  <u>United States v. Comunidades Unidas Contra La Contaminacion,</u> 204 F.3d 275, 279 (1st Cir. 2000) (under CWA, the Resource Conservation and Recovery Act ("RCRA") and CERCLA, the court must determine if the settlement is "fair, adequate, reasonable and consistent with the objectives of Congress."

      length and advocate its embodiment in a judicial decree, itself deserves weight in the ensuing balance."

United States v. Davis, 261 F.3d 1, 21 (1st Cir. 2001) (citations omitted); United States v. Cannons Eng'g Corp., 899 F.2d at 84 (the court should not engage in "second-guessing the Executive Branch").  As the First Circuit states, "[t]he relevant standard, after all, is not whether the settlement is one which the court itself might have fashioned, or considers as ideal. . . ."  United States v. Cannons Eng'g Corp., 899 F.2d at 84.

      Accordingly, the Court's role in this process is limited and the Court should not substitute its judgment for that of the parties.  Because the proposed settlement is fair, reasonable, consistent with the goals of CERCLA and FIFRA and in the public interest,  this Court should enter the Settlement Agreement.

B.  The Consent Decree should be approved by the Court

    1.  The Consent Decree Is Fair

      As discussed above, the first element courts consider when reviewing a consent decree is whether the settlement is fair.  Fairness of a CERCLA settlement involves both procedural fairness and substantive fairness.  United States v. Davis, 261 F.3d at 23.  Courts evaluate procedural fairness by considering the openness and candor of the bargaining process.  Davis 261 F.3d at 23, quoting Cannons, 899 F.2d at 86.

      Here, the Consent Decree is procedurally fair.  The United States filed a Motion to Enforce the Decree and a series of additional pleadings with the Court.  Defendants filed a series of pleadings in response.   The United States and the Settling Defendants conducted negotiations during which Plaintiff and Defendants had adverse interests.  All negotiations were conducted at

arms-length, and in good faith. Before the parties reached an agreement-in-principle, this Court heard argument on the United States' Motion and the parties' respective positions. Accordingly, prior to the date on which the parties reached an agreement-in-principle, the parties had been engaging in vigorous litigation about the substance of the case. Thus, the Settlement Agreement is procedurally fair.

The second element of the fairness inquiry is substantive fairness. As the First Circuit stated in Cannons "[s]ubstantive fairness introduces into the equation concepts of corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible." 899 F.2d at 87. see also Davis 261 F.3d at 23 ("A finding of procedural fairness may also be an acceptable proxy for substantive fairness, when other circumstantial indicia of fairness are present." ); United States v. Charles George Trucking, Inc., 34 F.3d 1081, 1087-89 (1st Cir. 1994). The terms of the settlement demonstrates the substantive fairness of the Decrees. As discussed below, the Settlement Agreement is substantively fair because the Settlement Agreement retains the detailed and strict injunctive relief measures contained in the Consent Decree which will protect the Community from harm posed by pesticide drift from the Farm, with several modifications to take into account current conditions.

2. The Settlement Is Reasonable

Three factors are primarily relevant to determining whether a CERCLA settlement is reasonable: "The assessment of reasonableness focuses on several elements: the effectiveness of the decree as a vehicle for cleaning the environment; providing satisfactory public compensation for actual (and anticipated) costs of remediation; and accounting for the relative strength of the parties' litigating positions and foreseeable risks of loss." Davis 261 F.3d at 26; Cannons, 899

F.2d at 89-90.  These same factors apply to cases under other environmental statutes.  <u>United States v. District of Columbia</u>, 933 F. Supp. 42, 50 (D.D.C. 1996); <u>United States v. Bliss</u>, 133 F.R.D. 559, 568 (E.D. Mo. 1990).

The Settlement Agreement satisfies all three prongs.

The first prong of the reasonableness inquiry is satisfied because the Settlement Agreement is protective.  The Consent Decree requires the Settling Defendants to implement a comprehensive set of injunctive relief measures that will protect the Guayanilla Community from the adverse impact of pesticide drift.  The injunctive relief measures are numerous, detailed, strict and work together to protect the Community from the adverse impact of pesticide drift.   The Settlement Agreement retains virtually all provisions of the Consent Decree.

Under the Consent Decree the Farm is required to create Buffer Zones along a portion of the western and the entire northern borders of the Farm by removing mango trees from these areas and by planting plantain trees which will not be sprayed with pesticides, in place of the mango trees.  The creation of this No-Spray Buffer Zone will minimize pesticide drift.  In addition, the Consent Decree requires the Farm to plant neem trees along nearly the entire northern border of the Farm and where the western border runs close to homes or public roadways.  In some areas, the Consent Decree requires the Farm to plant a two rows of neem trees and in other areas, a single row.  This vegetative barrier helps prevent drift by slowing the wind, thus reducing the distance that pesticide droplets can travel, and because the leaves of the neem trees also directly intercept pesticide droplets that might otherwise drift.   The Settlement Agreement maintains the requirement that the Farm plant neem trees.  The Settlement Agreement also maintains the obligation to remove mango trees and to plant plantains in their

place except that the schedule for completing these obligations is extended.[4]  The Settlement Agreement modifies the Consent Decree requirements for the No-Spray Buffer Zones only to account for treating the Sigatoka Negra plant disease.

These obligations, along with the numerous other protective measures required by the settlement, protect the Community and demonstrate that the Settlement Agreement is substantively fair.

The second factor in evaluating reasonableness, whether the public is adequately compensated, is easily satisfied by the proposed settlement.  Upon entry of the Consent Decree, Tropical Fruit was required to implement a comprehensive set of injunctive relief measures that ensure protection for the public.  Further, Defendants paid $35,000 in civil penalties and CERCLA response costs, installed an anemometer that cost about $5,000 and hired and paid an individual to monitor its pesticide hand-spraying applications at a cost of $10,000 per year for three years.   Thus, in the aggregate, the Defendants paid approximately $70,000 for these

---

[4]  In addition to the neem trees and the No-Spray Zones, the Decree also requires the Farm to implement a number of other measures that, separately, and taken together, will mitigate pesticide drift.  The wind speed restrictions ensure that pesticides are not sprayed when the wind is blowing below 2 miles per hour or above 6 miles per hour in sectors near residential areas. Applying pesticides only within the defined wind speed parameters will minimize drift. Moreover, the Decree requires the Farm to install a new, improved anemometer.  The new anemometer, unlike the equipment that existed prior to the entry of the Consent Decree, is required to be connected to a computer and will have the ability to determine when wind speeds fall outside the defined range set forth in the Consent Decree and alert the applicator of that fact. The Farm has purchased and is using this new anemometer.  Accordingly, the Farm is able to determine when wind conditions are unfavorable for pesticide spraying, to notify the person applying the pesticides of this fact and to stop applying pesticides when the wind becomes unfavorable.  In addition, the Decree requires the Farm to use drift retardants.   The Settlement Agreement maintains these requirements.

settlement terms alone.[5]   The Farm has already made the nearly $70,000 in expenditures.

The Settlement Agreement requires the payment of an additional $50,000 civil penalty. In light of the penalty and other expenditures that the Farm has already made, the additional $50,000 civil penalty is appropriate.   The United States submits that the entire settlement, including the monetary components, is reasonable.   See Davis, 261 F.3d at 26 ("Discounts on maximum potential liability as an incentive to settle are considered fair and reasonable under Congress's [CERCLA] statutory scheme.").

The final component of reasonableness is an evaluation of the relative strength of the parties' litigating positions.   Davis, 261 F.3d at 26 ("It is appropriate 'to factor into the equation any reasonable discounts for litigation risks, time savings, and the like that may be justified.'"), quoting Charles George, 34 F.3d at 1087);   A review of this matter reinforces the reasonableness of the Decree.   If forced to litigate the liability and technical issues resolved in the Settlement Agreement, the United States believes it would prevail.   Nonetheless, as with any technically complex case, issues can arise that delay or create uncertainty regarding the eventual resolution. The proposed Settlement Agreement retains virtually all of the many protective measures contained in the Consent Decree and only modified the Decree to allow the treatment of the Sigatoka Negra plant disease, which was not present when the Decree was entered in 2001.

Accordingly, the proposed Consent Decree is clearly reasonable.   The comprehensive and  expeditious injunctive relief measures will be very effective and protective; the injunctive

---

[5]   Of course, the Farm will incur substantial additional expenses when removing the many mango trees from the No-Spray Zones and planting plantains or bananas in their place.  While the Farm will earn income from the plantains or bananas that replace the mangos, the Farm represents that plantains generate less income than mangos.

relief measures and the monetary components adequately compensate the public; and the settlement reflects the relative strengths of litigation positions.

### 3. The Settlement Is Consistent With CERCLA's and FIFRA's Primary Goals and Is in the Public Interest

The overarching goals of CERCLA include accountability, desirability of an unsullied environment, and prompt response activities. Davis, 261 F.3d at 26 ("The purposes of CERCLA include expeditious remediation at waste sites, adequate compensation to the public fisc and the imposition of accountability."). Other important purposes of CERCLA are to promote finality and reduce transaction costs. See 42 U.S.C. § 9622(a); 1986 U.S.C.C.A.N. at 3055; United States v. Cannons Eng'g Corp., 899 F.2d at 90. In fact, there is a general public policy in favor of settlement to reduce costs to litigants and burdens on the courts. See, e.g., Weinberger v. Kendrick, 698 F.2d 61, 73 ($2^d$ Cir. 1982). This is particularly true in CERCLA cases. Davis, 261 F.3d at 27 ("Additionally, there is a 'strong public policy in favor of settlements, particularly in very complex and technical regulatory contexts.'"), quoting Comunidades Unidas, 204 F.3d at 280.

A goal of FIFRA is to protect health and the environment against any unreasonable adverse effects associated with pesticide use. See generally Section 3 of FIFRA, 7 U.S.C. § 136. The nature and scope of the injunctive relief included in the Decree furthers these goals.

The Settlement Agreement retains the Consent Decree requirements for an expeditious and comprehensive program to protect the Community from pesticide spray drift. The injunctive relief measures will be effective at eliminating unacceptable risks posed by pesticide drift and minimizing the amounts of actual pesticide drift associated with the Farm's pesticide applications. In short, the Settlement Agreement and Consent Decree are a very efficacious

vehicles for protecting public health and the environment.

The same reasons that demonstrate that the Consent Decree is consistent with the goals of CERCLA and FIFRA also establish that the settlement is in the public interest. The settlement also meets the goals of providing final resolution of the liability for settling parties and reducing litigation and transaction costs. Therefore, the final criterion to support entry of the Settlement Agreement is satisfied.

    4. <u>Status Conferences with the Court</u>

Finally, the Settlement Agreement provides for bimonthly status conferences with the Court so that the parties can raise issues concerning compliance with this Settlement Agreement. The parties respectfully request that this Honorable Court schedule bimonthly telephonic status conferences so that the Parties can raise any compliance issues.

<u>CONCLUSION</u>

For the forgoing reasons, the United States respectfully requests that this Court approve, sign and enter the proposed Settlement Agreement.

    Respectfully Submitted,

    KELLEY A. JOHNSON
    Acting Assistant Attorney General
    Environment and Natural Resources Division

    <u>/s/ Henry Friedman</u>
    HENRY S. FRIEDMAN, Senior Attorney
    USDC No. G00105
    JEROME MACLAUGHLIN, Trial Attorney
    Environmental Enforcement Section
    Environment and Natural Resources Division
    U.S. Department of Justice
    Benjamin Franklin Station
    P.O. Box 7611

        Washington, D.C. 20044
        (202) 514-5268

        H.S. GARCIA
        United States Attorney
        District of Puerto Rico


        ISABEL MUNOZ
        Assistant United States Attorney
        USDC No. 128302
        District of Puerto Rico
        Federal Building, Room 452
        Chardon Avenue
        Hato Rey, Puerto Rico  00918
        (787) 766-5656


OF COUNSEL:

ERIC SCHAAF,  Regional Counsel
NAOMI SHAPIRO, Assistant Regional Counsel
LOURDES RODRIGUEZ, Assistant Regional Counsel
U.S. Environmental Protection Agency Region II
290 Broadway, 16th Floor
New York, New York  10007
(212) 637-3221

CERTIFICATE OF SERVICE

      I, Henry S. Friedman, hereby certify that copies of the **UNITED STATES' MOTION TO ENTER SETTLEMENT AGREEMENT AND MEMORANDUM IN SUPPORT THEREOF**, were filed electronically with the Clerk of Court using the CM/ECF System which will send notification to Jaime Sifre, Esq. and Marta E. Vila Baez, counsel for Defendants. In addition, copies of the **UNITED STATES' MOTION TO ENTER SETTLEMENT AGREEMENT AND MEMORANDUM IN SUPPORT THEREOF** were also served on November 14, 2005, by electronic mail to jsifre@sbsmnr.com and mvila@sbsmnr.com.

    /s/ Henry Friedman
    HENRY S. FRIEDMAN